UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

STEVEN MOTTA,

                                                     Plaintiff,

            vs.

                                                             9:06-CV-1047
DR. LESTER WRIGHT, Deputy Commissioner              (NAM/GJD)
of Health Services, NYS DOCS; DR. SYED
HAIDER SHAH, Marcy Correctional Facility,

                                                     Defendants.
_____

STEVEN MOTTA, Plaintiff *Pro Se*
HEATHER R. RUBINSTEIN, Asst. Attorney General for Defendants

GUSTAVE J. DI BIANCO, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to the undersigned for Report and
Recommendation by the Honorable Norman A. Mordue, Chief United States District
Judge pursuant to 28 U.S.C. § 636 (b) and Local Rules N.D.N.Y. 72.3(c).

In this civil rights complaint, plaintiff alleges that defendants denied him
constitutionally adequate medical care from October 10, 2002 until June 1, 2006,
while plaintiff was an inmate in the custody of the Department of Correctional
Services (DOCS) at Marcy Correctional Facility (Marcy). Complaint (Dkt. No. 1).  In
the jurisdictional section of the complaint, in addition to 42 U.S.C. § 1983, plaintiff
cites the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*;the
Rehabilitation Act (RA), 29 U. S. C. § 794; and 42 U.S.C. §§ 1985, 1988. Compl.  ¶ 8.
In the body of the complaint plaintiff also quotes the text of the ADA, RA, and

sections 1985 and 1988.[1] Compl. ¶¶ 67, 68-69.  Plaintiff's Causes of Action, however, do not mention these statutes.  The complaint contains seven causes of action and all of them state that they are violations of the "Eighth and Fourteenth Amendments." Compl. ¶¶ 73-88.The complaint seeks declaratory and substantial monetary relief.[2] Compl. at 28.

Presently before this court is defendants' motion for summary judgment, pursuant to FED. R. CIV. P. 56. (Dkt. No. 29).  Plaintiff has responded in opposition to the motion. (Dkt. No. 33).  Although the docket sheet indicates that defendants have filed a "Reply," the document filed is simply "dated copies of signature pages from the Declarations of Dr. Haider Shah and Dr. Wright" that were originally filed in support of defendants' motion for summary judgment.[3] (Dkt. No. 34).  For the following reasons, this court agrees with defendants and will recommend dismissing plaintiff's complaint.

---

[1] The jurisdictional section also mentions unspecified state law claims. Compl. ¶ 8.

[2] The complaint also requests "costs and disbursements," including "reasonable attorneys fees" and asks for permission to "be placed before District Court Judge David N. Hurd, who presides over the recently certified class action suit in Hinton v. Wright," . . . ."  Plaintiff is referring to *Hilton v. Wright*, 235 F.R.D. 40 (N.D.N.Y. 2006).  The court would point out that a *pro se* litigant is not entitled to attorneys fees under 42 U.S.C. § 1988. *See SEC v. Price Waterhouse*, 41 F.3d 805, 808 (2d Cir. 1994).  This would be true even it the *pro se* plaintiff were an attorney. *See Kay v. Ehrler*, 499 U.S. 432 (1991).  Thus, plaintiff would not be entitled to attorneys fees even if he were successful in the action.  The court will discuss plaintiff's request regarding the class action later in this report.

[3] Plaintiff's first argument in opposition to the defendants' motion was that the defendants' Declarations were unsigned and undated and, thus, not admissible in support of the motion. Plaintiff's Memorandum of Law at 2. (Dkt. No. 33).  Defendants corrected their error by submitting copies of the appropriate signed and dated pages, together with a certificate of service on plaintiff, but this correction is docked as a "Reply." (Dkt. No. 34).

## DISCUSSION

1. <u>**Summary Judgment**</u>

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id*. However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006)(citing *Celotex Corp.*, 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying

the opponent's pleadings. *Id*.

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id*. A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Additionally, while a court "'is not required to consider what the parties fail to point out,'" the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted). Plaintiff in this case has responded to defendants' motion, however, the court will still carefully review the entire record in making its determination.

## 2.  <u>Facts and Contentions</u>

In his complaint, plaintiff states that he has been in the custody of DOCS since 1982, and has Hepatitis-C (HCV).[4]  Plaintiff's medical records show that he was diagnosed with HCV in December of 1995. Haider Shah Decl. ¶ 9 & Ex. A[5] at 503.

---

[4] Plaintiff disputes when he contracted the illness. Plaintiff states that he contracted the virus **after** he was incarcerated, and defendants state that plaintiff became infected sometime **prior** to his incarceration in 1982. This dispute is not relevant to the court's analysis since it is undisputed that he was not diagnosed with HCV until December of 1995.

[5] Defendant Haider Shah has submitted a declaration in support of defendants' motion for summary judgment. Exhibit A are plaintiff's medical records including his Ambulatory Health

4

The first several paragraphs of plaintiff's complaint are entitled "INTRODUCTION" and discuss plaintiff's allegations generally. Compl. ¶¶ 1-7.  The complaint then contains a section entitled "ALLEGATIONS," containing a more specific statement of facts and chronology of plaintiff's claims. Compl. ¶¶ 25-63.

Plaintiff alleges that after he arrived at Marcy on October 10, 2002, defendant Dr. Haider Shah failed to monitor plaintiff's elevated liver function tests (LFT's) for nineteen months, in violation of the HCV "protocol"[6] and failed to refer plaintiff to a liver specialist. Compl. ¶ 1.  Plaintiff claims that defendant Haider Shah refused to give plaintiff HCV treatment "on a number of occasions" for improper reasons, including that plaintiff was too close to being paroled; needed psychiatric clearance; or "needed outside clearance." Compl. ¶ 2.  Plaintiff states that defendant Haider Shah failed to order the prescribed liver biopsy on October 20, 2005 and failed to seek psychiatric clearance for plaintiff until October 20, 2005. *Id.*  Plaintiff claims that once defendant Haider Shah obtained the psychiatric clearance in October of 2005, he delayed giving plaintiff the HCV treatment for another nine months. *Id.*

Plaintiff states that he filed two grievances regarding his medical care. Compl.

---

Record (AHR) and other relevant medical records.  An inmate's AHR contains entries referring to medical visits on particular days, however, multiple visits are recorded on each day, with up to three visits from three dates recorded on one page.  Exhibit A has been paginated, and the page numbers appear at the bottom.  Thus, the court will cite to the page number of Exhibit A with further citation to the date of a particular entry of the AHR if necessary.

[6] Plaintiff is referring to the DOCS Division of Health Services "protocol" entitled "Hepatitis C Primary Care Practice Guidelines." (DOCS Guidelines).  Defendants have submitted various revisions of the DOCS Guidelines, dated January 17, 2000; July 20, 2004; and October 13, 2005. Wright Decl. Ex. A-1-A-3

¶¶ 3-4.  Plaintiff claims that defendant Haider Shah did not order a genotype blood test until February 14, 2006, after plaintiff's second grievance was filed, and "after nineteen straight months of no blood tests at all." Compl. ¶ 4.  Plaintiff states that only after he filed his second grievance, did defendant Haider Shah begin to check plaintiff's liver function.  On June 1, 2006, plaintiff claims that he vomited in front of a nurse, and that on the same day, plaintiff was examined by defendant Haider Shah, who had plaintiff sign a "Contract for Specialty Care" appointment, and requested medication for plaintiff from defendant Wright. Compl. ¶ 6.  Plaintiff states that if it had not been for the vomiting incident, defendant Haider Shah never would have ordered the medication that eventually was started on June 9, 2006. Compl. ¶ 7.

In the complaint, plaintiff has listed a number of medical terms that are associated with HCV. Compl. ¶¶ 12-24.  Plaintiff has filed a substantial number of documents in support of his complaint, including numerous medical records and other references concerning HCV. Compl. App. A-C.  Plaintiff begins the "Allegations" portion of the complaint by outlining the facts surrounding the diagnosis and care of his condition since October 10, 1990, when a laboratory report of blood tests taken at Elmira Correctional Facility, showed that plaintiff tested positive for Hepatitis A[7] (HAV) and B (HBV). Compl. ¶ 26 & App. B at 3-5.

Plaintiff was diagnosed with HCV on December 12, 1995, while he was in Clinton Correctional Facility. Compl. ¶ 28.  Plaintiff states that the tests showed an

---

[7] Plaintiff states that the tests were positive for both A and B, but the pages he cites only show that the tests were positive for Hepatitis B. Compl. App. B at 3-5.

"out of control chronic Hepatitis C virus," and that although plaintiff complained of liver pain, dizziness, and nausea, he was not scheduled to see a "liver specialist." *Id.* The complaint discusses 1995 through 2002, stating that at various times, plaintiff complained about symptoms that he was experiencing. Compl. ¶¶ 29-34.

Plaintiff states that in June of 1999, he was incarcerated at Riverview Correctional Facility and experienced dizzy spells. Compl. ¶ 33. Plaintiff states that on June 15, 1999, Dr. R. Hentschel noted that plaintiff was positive for HCV and recommended a follow-up with a private physician, "Rx medication for hepatitis C, [and] lab monitoring."[8] Compl. ¶ 33 (citing App. B at 40-45). Plaintiff states that when he was at Franklin Correctional Facility in April of 2002, he requested medication for HCV and signed consent forms. Compl. ¶ 34. Plaintiff's Ambulatory Health Record (AHR) indicates that he was interested in HCV treatment, and he signed consent forms in April of 2002. Pl. App. at 65 (AHR entries of 4/8 and 4/11/02).

Plaintiff was transferred to Marcy in October of 2002, and plaintiff states that on October 17, 2002, he requested HCV treatment again, and that defendant Haider Shah told plaintiff that he would review the policy and record to see if plaintiff met the criteria for medication. Compl. ¶ 35 (citing App. B at 71 AHR entry of 10/17/02). Plaintiff then states that on October 23, 2002, he requested HCV treatment and a

---

[8] The court must point out that in the pages of the medical records cited by plaintiff there is no reference to "medication." Pl. App. B at 41. It is unclear what Dr. Hentschel wrote. The notation appears to be "Needs f/u private physician Rx of Hepatitis C. Lab monitoring." Pl. App. at 41.

"Nurse" told plaintiff that he needed psychiatric clearance.[9] *Id.* Plaintiff states that after the October 17, 2002 "examination," defendant Haider Shah failed to administer a course of treatment; send plaintiff to a private physician; and monitor his liver function every six months as ordered by Dr. Hentschel in 1999. Compl. ¶ 37.

Plaintiff states that he was examined by defendant Haider Shah on August 7, 2003 and told that he was not ready for medication because he was "too close to going home." Compl. ¶ 39. Plaintiff then cites various laboratory test results, showing that he had a high HCV viral load in 2003. Compl. ¶¶ 40-41. Plaintiff states that consistent with the high viral count, he went to sick call on August 13, 2003, January 7, 2004, and March 31, 2004. Compl. ¶ 42. Plaintiff claims that although he had serious symptoms, no medical action was taken. *Id.* Plaintiff then cites additional dates on which he was tested. Compl. ¶¶ 43-47.

Plaintiff states that on January 9, 2004, he had a liver function test, and the notation on the report stated that plaintiff "needs to be seen." Compl. ¶ 43. On October 20, 2004, defendant Haider Shah sent plaintiff for a CAT Scan of his abdomen to rule out a bile duct obstruction. Compl. ¶ 45. The CAT Scan was

---

[9] Plaintiff is again mistaken regarding his citation to the record. Pages 70 and 71 of plaintiff's appendix are copies of the same page. The ***October 17, 2002*** entry is written by Nurse K. Dooley. App. B at 70, 71. Nurse Dooley states that plaintiff is requesting treatment for HCV, and Nurse Dooley stated that she would consult P. Perrotta about reviewing the record to determine whether plaintiff met the criteria. The entry dated October 23, 2002 contains the notation of a variety of requests made by plaintiff, including vaccine for Hepatitis A and B; a lead-level test because of a gunshot wound; a memory test; and HCV treatment. Pl. App. B at 70, 71. The entry ends with the notation "Psych Clearance for Possible Hep C Rx." *Id.* Defendant Haider Shah states in his declaration that ***he*** met with plaintiff on October 23, 2002. Haider Shah Decl. ¶ 11.

performed on November 5, 2004. *Id.* (citing App. B at 83).  Plaintiff states that on

October 13, 2005, defendant Lester Wright sent a memorandum, rescinding the DOCS

policy that would prevent an inmate from having HCV treatment if he had not

participated in the Alcohol and Substance Abuse Treatment (ASAT)/ Residential and

Substance Abuse Treatment (RSAT) programs. Compl. ¶ 48.  At the same time,

defendant Wright rescinded that policy prohibiting approval for HCV treatment if the

inmate were going to be released prior to the completion of the treatment. *Id.* (citing

Pl. App. A - HCV Guidelines dated 2/10/06).

Plaintiff states that on October 20, 2005, he asked again for the HCV treatment

and discovered that he had not received psychiatric clearance. Compl.    ¶ 49.

Plaintiff states that the sick call nurse cited to the AHR dated 10/20/04, 6/25/04,

10/23/02 after she noted that there was no psychiatric clearance in the medical

records. Compl. ¶ 49.  Plaintiff claims that the main reason that he did not obtain his

treatment was that he did not have psychiatric clearance, but maintains that no request

had ever been made for the clearance. *Id.*

Plaintiff states that he the request was finally made on October 20, 2005, and he

obtained the psychiatric clearance on the same day, using the same form upon which

the request was written. Compl. ¶ 50 & App. B at 90.  Plaintiff claims that on January

4, 2006, he complained to defendant Haider Shah about some of the symptoms

plaintiff had been having. Compl. ¶ 52.  Plaintiff alleges that during the examination,

defendant Haider Shah was going through the medical records and "deliberately lied"

about not receiving a reply from the Mental Health Department, when in fact the

clearance had been sent on October 20, 2005. *Id.*

Plaintiff states that he wrote a grievance on January 14, 2006 that was consolidated with a prior grievance dated November 15, 2002. Compl. ¶ 53.  Plaintiff states that he had an Inmate Grievance Resolution Committee (IGRC) hearing, but that the IGRC could not override a medical decision. *Id.*  Plaintiff states that the Superintendent denied his grievance on January 30, 2006, in part because the medical department was waiting for the psychiatric clearance, and that when that clearance was obtained, the medical department would pursue the next step. Compl. ¶ 54. Plaintiff appealed the grievance, stating that he had already received the clearance, but that in any event, he had met the criteria "for years." Compl. ¶ 55.

In the meantime, on February 15, 2006, defendant Haider Shah made a request for plaintiff to have a liver biopsy which was completed on March 27, 2006. Compl. ¶¶ 57-58.  Plaintiff claims that on June 1, 2006, he reported for sick call and vomited in front of the nurse. Compl. ¶ 59.  Plaintiff states that the nurse wrote in the AHR that plaintiff was seeking HCV treatment. *Id.*  Plaintiff states that he was examined by defendant Haider Shah on the same day and that plaintiff signed the "Contract for a Specialty Care Appointment." Compl. ¶ 60.  Plaintiff states that his HCV treatment began on June 9, 2006, however, if it had not been for the incident in which plaintiff vomited in front of the nurse, "Defendant Haider Shah would never have ordered the medication . . . ." Compl. ¶ 61.

Finally, plaintiff states that on July 5, 2006, defendant Haider Shah informed plaintiff that the high "iron readings" on his liver function tests were the "number one

'**killer,**' for him." Compl. ¶ 62 (emphasis in original).  Plaintiff stated that his iron

levels had always been high and asked defendant Haider Shah whether there was any

medication that could bring plaintiff's iron levels down. *Id.*  Plaintiff states that

defendant Haider Shah told plaintiff that such medication existed, but that he did not

believe that plaintiff needed it at the time. *Id.*

Essentially, plaintiff claims that the delay in his treatment caused him serious

physical and emotional injury since plaintiff now has fibrosis of the liver that cannot

be cured "except by way of liver transplant . . . ." Compl. ¶ 63.  Plaintiff alleges that

defendant Wright may be held liable for failure to train and supervise his medical

employees in the care of inmates such as plaintiff, who have been identified by their

treating physicians as being in need of treatment for HCV. Compl. ¶ 70.  Plaintiff also

seeks to hold defendant Wright liable for establishing an unconstitutional policy and

custom of refusing to administer treatment because inmates are too close to going

home or because plaintiff did not complete a substance abuse program. Compl. ¶ 71.

The complaint contains seven causes of action, each  referring ***only*** to the

Eighth and Fourteenth Amendments and not to any statutory basis for relief.[10]

_____

[10] In any event, the court would point out that while the defendants must be sued in their
individual capacities for purposes of section 1983, defendants may ***not*** be sued in their
"individual" capacities for violations of the ADA or the RA. *Garcia v. S.U.N.Y. Health Science
Center of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001).  Thus, any suit for statutory relief would be
against the defendants in their "official" capacities.  Without discussing whether the Eleventh
Amendment in this case would bar damage relief against the State (defendants in their "official"
capacities), the court would merely note that plaintiff does not state a claim under the ADA or
the RA. *See e.g. Carrion v. Wilkinson*, 309 F. Supp. 2d 1007 (D. Ohio 2004).
In *Carrion*, the court specifically stated that the ADA and RA "afford disabled persons
legal rights regarding access to programs and activities enjoyed by all, but do not provide them
with a general federal cause of action for challenging the medical treatment of their underlying

(1)     Defendant Haider Shah violated plaintiff's Eighth and Fourteenth
        Amendment rights when he delayed plaintiff's HCV treatment from
        October 17, 2002 until June 1, 2006.

(2)     Defendant Haider Shah was deliberately indifferent to plaintiff's serious
        medical needs when he delayed plaintiff's HCV treatments until June 1,
        2006, even after he received the psychiatric clearance on October 20,
        2005.

(3)     Defendant Haider Shah was deliberately indifferent to plaintiff's serious
        medical needs when he departed from the "new" HCV Primary Care
        Guidelines from October 20, 2005 until June 1, 2006.

(4)     Defendant Haider Shah was deliberately indifferent to plaintiff's serious
        medical needs when he failed to administer liver function tests every
        eight to twelve weeks.

(5)     Defendant Haider Shah was deliberately indifferent to plaintiff's serious
        medical needs when he ignored "numerous 'red flags'" regarding
        plaintiff's condition that indicated that plaintiff was in need of immediate
        treatment.

(6)     Defendant Wright is responsible for the delay between October 23, 2002
        and October 13, 2005, when he changed the HCV policy.

(7)     Defendants Wright and Haider Shah were deliberately indifferent to
        plaintiff's serious medical needs when defendant Haider Shah refused to
        administer HCV treatment on August 7, 2003 because plaintiff was "too
        close to going home."

Compl. ¶¶ 73-88.

        Both defendants have submitted declarations in support of their motion for

_____

disabilities." *Id.* (quoting *Galvin v. Cook*, CV-00-29, 2000 U.S. Dist. LEXIS 15181, *19-20,
2000 WL 1520231 at *6 (D. Ore. Oct. 3, 2000)).  Plaintiff in this case is only challenging the
medical treatment of his underlying medical condition, thus, he could not proceed under either
the ADA or the RA, even if this court were to interpret his complaint to raise those claims.  The
court will analyze this case under the Eighth and Fourteenth Amendment claims that plaintiff
includes in his "Causes of Action." Compl. ¶¶ 73-88.

summary judgment. (Dkt. Nos. 29-15, 29-16).  Defendants have also submitted the declaration of John B. Rogers, M.D., whose primary area of practice is Gastroenterology. Rogers Decl. (Dkt. No. 29-21).  Dr. Rogers has examined a copy of plaintiff's medical records, dating back to 1995. Rogers Decl. ¶¶ 4, 7 & Ex. B.

Defendant Haider Shah states that he is a clinical care physician with the Medical Department at Marcy, and he has been providing medical services to plaintiff since his arrival at Marcy in 2002 and during the time period relevant to this case. Haider Shah Decl. ¶¶ 2, 4.  Defendant Haider Shah has also submitted copies of plaintiff's medical records as Exhibit A.[11]  In his declaration, defendant Haider Shah gives a short description of HCV in general, stating that, while it is a serious infection, is progression is variable and generally slow. Haider Shah Decl.  ¶ 10.  Defendant Haider Shah states that HCV may go undetected for a number of years without physical signs or symptoms. *Id.* ¶ 7.

Dr. Rogers states that HCV has the potential of producing cirrhosis of the liver and/or liver cancer. Rogers Decl. ¶ 10.  HCV is the leading cause of liver cancer in the United States, and thus, it is important to treat the disease "when possible." *Id.*  Dr. Rogers states that advances in treatment during the past *six* years have been "particularly helpful," but notwithstanding these advancements, it is not yet possible to cure all individuals who are infected with HCV. *Id.*

---

[11] The medical records have been "traditionally filed" and are not part of the electronic docket.  The court notes the medical records submitted by plaintiff are also contained in the defendants' exhibits, except for those records from prior to 1995 that plaintiff has submitted in his appendices.  Defendants medical records are more extensive than those submitted by plaintiff.

13

The current drug treatment for HCV is a combination of two drugs, pegylated interferon and ribavarin. Rogers Decl. ¶ 11.  Dr. Rogers states that treatment is often difficult for the patient because these drugs have many serious side effects, some of which can be considered life-threatening. *Id.*  Thus, before starting this treatment, patients must be carefully evaluated to determine if they will have a good chance of tolerating the treatment itself. *Id.*  Dr. Rogers states that it is also important to check patients for "coinfections" with Hepatitis B (HBV) or human immune deficiency virus (HIV) because the treatment "is very likely to fail" if the patient has either one of those viruses in addition to HCV. *Id.*

Because of all the above variables regarding whether the existing drug treatment is appropriate, and because of the great number of inmates infected with HCV, DOCS has developed a "protocol" to make certain that all of the necessary information is considered regarding each patient with HCV before starting the drug treatment. Rogers Decl. ¶ 11; Wright Decl. ¶¶ 4-7.  Defendant Wright states that DOCS develops and regularly updates "Clinical Practice Guidelines" for various diseases in an effort to maintain the consistency of care and stay current with scientific advances. Wright Decl. ¶ 5.  The "Hepatitis C Primary Care Practice Guideline"(the Guidelines) used by DOCS was initially approved on March 31, 1999 and revised December 17, 1999, December 13, 2000, July 20, 2004, and October 13, 2005. Wright Decl. ¶ 6.  Copies of these Guidelines are included as Exhibits A-1 to A-3, attached to defendant Wright's declaration.

Defendant Wright states that the Guidelines were developed by a task force of

14

physicians and other health professionals, including DOCS practitioners, and experts from medical colleges and hospitals. Wright Decl. ¶ 5.  The Guidelines are based upon many sources of information and research regarding HCV, including publications of the National Institutes of Health (NIH); the United States Centers for Disease Control; the New York State Department of Heath Bureau of Communicable Disease Control; the New England Journal of Medicine; and the Federal Bureau of Prisons Treatment Guidelines for Viral Hepatitis. Wright Decl. ¶¶ 7-8.

Dr. Rogers states that it is now possible to achieve a "cure" in almost fifty percent of the HCV cases after 24 to 48 weeks of treatment, "depending upon the genotype of the virus." Rogers Decl. ¶ 12.  Dr. Rogers states that it is "well worth the risks and costs of therapy to prevent the development of cirrhosis of the liver and/or liver cancer which often develops in patients with untreated HCV." Rogers Decl. ¶ 12. If the patient's viral levels remain undetectable six months after completion of the drug therapy, it is considered a "sustained viral response" and the patient may be considered "cured," however, relapses have been reported. Rogers Decl. ¶ 13.  The likelihood of a relapse depends upon "individualized" factors, including the virus genotype, the patient's ethnicity, gender, age, the duration of the disease, and alcohol use. *Id.*

The "current" treatment with pegylated interferon and ribavirin was approved by the United States Food and Drug Administration (FDA) in 2001. Wright Decl. ¶ 12.  However, there are patients that do not achieve sustained suppression of the virus even after treatment, and they are referred to as "nonresponders." Wright Aff. ¶ 13.

15

Defendant Wright states that at this time, there is no alternative treatment for these individuals. *Id.* There are also patients called "relapsers," who initially respond to the treatment, but experience a re-emergence of the virus. *Id.* In the case of a "relapser," it may be appropriate to explore re-treatment with variations on the duration of therapy and/or the dosage of the drugs. *Id.*

Defendant Haider Shah states that plaintiff was diagnosed with HCV in December of 1995, but was not transferred to Marcy until October of 2002. Haider Shah Decl. ¶¶ 8-9. In 1992, it had been determined that plaintiff had also been exposed to Hepatitis A and B, but had acquired immunity to those viruses. *Id.* ¶ 9. By the time that he was transferred to Marcy, plaintiff's HCV had already progressed to the "chronic" stage. *Id.* Defendant Haider Shah had no responsibility for plaintiff's care until he was transferred to Marcy in 2002.

Defendant Haider Shah states that he met with plaintiff on October 23, 2002.[12] The medical records confirm that October 23, 2002 was the first time that defendant Haider Shah met with plaintiff at Marcy. Haider Shah Decl. Ex. A at 331. On October 17, 2002, plaintiff met with ***Nurse Dooley***, and he told the nurse that he wanted a lead level test because he had metal fragments in his abdomen;[13] wanted a treatment plan for his HCV; wanted "injections" for his HAV and HBV; and had some concerns

---

[12] Although as stated above, plaintiff states that the October 17, 2002 AHR entry was based on an examination by defendant Haider Shah, it is clear that the October 17th entry was written by Nurse Dooley, and that defendant Haider Shah's entry is dated October 23rd. Haider Shah Decl. Ex. A at 331.

[13] These fragments were apparently the residue of a gunshot wound. Haider Shah Decl. Ex. A at 331.

about his memory. *Id.*

Nurse Dooley advised plaintiff of the "policy" regarding reviewing the record and determining whether plaintiff met the criteria for treatment. *Id.*  Nurse Dooley also stated that there would be a follow up with Nurse Perrotta to "review for need." *Id.* Nurse Dooley also questioned the need for "injections" because the medical records indicated "immunity" for HAV and HBV. *Id.*  Finally, Nurse Dooley wrote in the AHR entry that plaintiff had an "md" appointment on October 23, 2002. *Id.*

Dr. Haider Shah states that when he met with plaintiff on October 23, they discussed various medical issues. Haider Shah Decl. ¶ 11 & Ex. A at 331.  Defendant Haider Shah told plaintiff that the vaccinations for HAV and HBV were not necessary[14] and the lead level testing was not necessary. *Id.*  Defendant Haider Shah also noted that plaintiff was requesting treatment for HCV, and states in his declaration that he "made a notation on [plaintiff's] AHR requesting a psychiatric consultation . . . this was the first of a series of such requests." Haider Shah Decl.  ¶ 12 & Ex. A at 311.

Defendant Haider Shah states that some of the risks involved in the HCV treatment include suppression of the bone marrow; damage to the thyroid gland; damage to the heart and kidneys; and depression that can lead to suicide. Haider Shah Decl. ¶ 16.  Dr. Haider Shah states that due to the risks, the slow rate of the disease's progression, and the moderate success of the current treatment, "very often it is most

---

[14] The reason that vaccinations were not necessary was that although plaintiff had been exposed to both HAV and HBV, the tests showed that his body had already developed an immunity to both. *See* Pl. App. C at 29 ("medical conditions").

reasonable to refrain from drug therapy entirely and await the next innovation in treatment." Haider Shah Decl. ¶ 17.

Defendant Haider Shah states that when an inmate/patient has a history of depression or other serious mental disorder, he must be examined by a psychiatrist and issued a clearance to proceed with the drug therapy for HCV. *Id.* ¶ 21.  The drugs may sometimes trigger depression even in those who have no prior psychiatric history, but those who do have such a history are "particularly susceptible." *Id.*  Thus, before a DOCS treating physician will submit an HCV treatment request to Albany,[15] a psychiatric clearance must be obtained for the inmate. *Id.*  A psychiatric clearance is obtained by the DOCS physician submitting a referral/consultation request to the Office of Mental Health (OMH), which oversees the provision of mental hygiene services to DOCS inmates. Haider Shah Decl. ¶ 22.  Defendant Haider Shah states that OMH processes and fulfills the request "in due course." *Id.*

Defendant Haider Shah states that prior to 2002 and during the following years, plaintiff had a "significant history" of clinical depression, was seen by a psychiatrist, and was prescribed medication on a number of occasions. Haider Shah Decl. ¶ 23. Defendant Haider Shah states that "we submitted multiple requests for psychiatric evaluations between October of 2002 and October of 2005, when the clearance was finally obtained. *Id.*¶ 24 (citing Ex. A at 331 (10/23/02 request); 261 (10/29/04 request); 245-47 (8/5/05 request); and 239 (10/20/05 request)); Pl. App. B at 89-92.

---

[15] Before an inmate may be treated for HCV, the treating physician must submit a request for treatment to defendant Wright, the Chief Medical Officer of DOCS. Haider Shah Decl. ¶ 20.

Defendant Haider Shah speculates that "it may well be" that the psychiatrists did not clear plaintiff for treatment earlier because between 2002 and 2005, plaintiff was reporting symptoms of depression and was receiving medication off and on for the condition. *Id.* ¶ 25 (citing Ex. A at 293-94 (4/8/04 consult/treatment for depression)).

On October 30, 2002, plaintiff had laboratory tests related to his HCV diagnosis. Haider Shah Decl. Ex. A at 325-27.  Between 2002 and 2005, testing was done in August of 2003; in January of 2004; February of 2004; in April of 2004; in June of 2004; in July of 2004; in August of 2004; and in May of 2005. Haider Shah Decl, Ex. A at 312-15;[16] Pl. App. B at 77; Haider Shah Decl. Ex. A at 305-309; 290; 284-85; 278; 273-74; and 250.  Plaintiff had laboratory testing in February of 2006[17] and twice in March of 2006. Haider Shah Decl. Ex. A at 220-23; 207-208. After plaintiff started his treatments in June of 2006, he was receiving regular laboratory testing to monitor his blood levels. Ex. A at 226 (chart of lab testing). *See also* Pl. App. B at 109 (AHR of June 22, 2006 - HCV tracking note regarding the frequency of lab testing).

It appears from the medical records that as of January 4, 2006, defendant Haider Shah did not know that the psychiatric clearance had been obtained. Haider Shah Decl. Ex. A at 235 (AHR dated January 4, 2006).  However,  by February 15, 2006, defendant Haider Shah had requested a referral to a gastroenterologist to approve the

---

[16] Plaintiff's August 13, 2003 AHR entry has a "Lab" notation, and the following AHR entry for what appears to be February 2004 states "Last Labs 8/03." Pl. Ex. B at 75.

[17] The record indicates that on February 11 and 15, 2006. plaintiff did not show up for his laboratory testing, and the tests had to be rescheduled. Haider Shah Decl. Ex. A at 227.

HCV treatment and for a liver biopsy, noting that the psychiatric clearance had been obtained. Haider Shah Decl. Ex. A at 190 (Referral dated February 15, 2006).  On March 20, 2006, plaintiff's history and physical were done in anticipation of his liver biopsy. Haider Shah Decl. Ex. A at 210.  Plaintiff had the biopsy on March 27, 2006. *Id.* Ex. A at 195 (surgical pathology report of biopsy)[18].  The biopsy report indicated that plaintiff's diagnosis was "chronic hepatitis with stage 3 fibrosis." Haider Shah Decl. ¶ 33 & Ex. A at 195.  Defendant Haider Shah states that they then obtained additional blood chemistry tests, including a thyroid hormone analysis. *Id.* & Ex. A at 186.  On June 1, 2006, defendant Haider Shah requested a repeat CT Scan based on the plaintiff's complaints of nausea and pain in the area of the lesion. Haider Shah Decl. Ex. A at 180.  Defendant Haider Shah states that after considering all the available information, including the biopsy result, he determined that it was appropriate to proceed with the drug therapy requested by plaintiff. Haider Shah Decl. ¶ 33.  Final approval was requested from DOCS, and plaintiff obtained his first of a twenty four week dose of HCV medication on June 6, 2006. *Id.*

After plaintiff began his drug treatment, the medical records show constant monitoring.  In July of 2006, plaintiff complained of abdominal pain, and another CT Scan was performed on July 21, 2006. Haider Shah Decl. Ex. A at 160.  On August 3, 2006, plaintiff was noted to be continuing his treatment without complaints. *Id.* at 157.  However, on August 6, 2006, plaintiff was "agitated" and wanted to be referred to the mental health department. *Id.* at 155-56.  Plaintiff was crying and wringing his hands,

---

[18] Page 197 of Ex. A is a copy of the biopsy report.

but denied thoughts of self-harm or harm to others. *Id.*

There are approximately eight entries in plaintiff's medical records in August 2006 alone. *Id.* at 142-53.  Plaintiff had laboratory tests and was examined for complaints of headaches. *Id.*  The monitoring continued through September and October. *Id.* at 122-42.  In November of 2006, plaintiff had an abnormal thyroid and platelet count. *Id.* at 112-16.  Plaintiff completed his HCV treatment on December 11, 2006 after 24 weeks. *Id.* at 105.  Defendant Haider Shah states that upon completion of the treatment, plaintiff's virus had dropped to undetectable levels. Haider Shah Decl. ¶ 34.  However, the virus has re-emerged. *Id.*  Both defendant Haider Shah and Dr. Rogers state that the timing of the treatment was not related to the re-emergence of the virus, and that it was unlikely that drug therapy in 2002 would have been any more successful. Haider Shah Decl. ¶ 34; Rogers Decl. ¶ 14.  Defendant Haider Shah states that the viral response to the drug therapy depended upon the effect of the drugs upon plaintiff's particular virus and not upon the timing of the drugs. *Id.* ¶ 34.

Plaintiff filed this action on August 29, 2006, during the time that he was receiving his drug treatment. (Dkt. No. 1).  Defendants have submitted a great deal of medical records relating to plaintiff's medical care, even after he filed this complaint. A CT Scan performed on January 3, 2007 showed that the lesion in plaintiff's liver had increased in size from 8 by 13 millimeters to 13 by 15 millimeters. Haider Shah Decl. Ex. A at 91.  His monitoring continued, however, most of the AHR entries for January and part of February of 2007 are unrelated to plaintiff's HCV. *Id.* at 84-88. Plaintiff was transferred to Elmira Correctional Facility (Elmira) on February 15,

21

2007. *Id*. at 79-84.

Although plaintiff received laboratory tests while at Elmira, most of the AHR entries are unrelated to plaintiff's HCV. *Id.* at 61-76.  Plaintiff was transferred to Clinton Correctional Facility in June of 2007. *Id.* at 58-61.  On March 4, 2008, while still at Clinton, plaintiff was examined by an endocrinologist for abnormal thyroid function. *Id.* at 20.  The consultant stated that plaintiff's abnormal thyroid readings were likely due to the HCV, however, the consultant stated that plaintiff "[d]oes not need treatment as Interferon is known to be able to cause . . . abnormalities in thyroid function . . . ." *Id.*  The doctor suggested another test in six to eight months. *Id.* at 9, 20.

## 3.     Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)(citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction.  *Id.*  The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong.  *Id.*  Personal involvement may also exist if the official created a policy or

22

custom under which unconstitutional practices occurred or allowed such a policy or custom to continue.  *Id.*  Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event.  *Id.  See Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

In this case, it is clear that defendant Wright, who is the Chief Medical Officer of DOCS, was not involved in plaintiff's day-to-day medical care and was in no way involved in plaintiff's case. Wright Decl. ¶ 3.  The only "involvement" by defendant Wright would have been when defendant Haider Shah made the request for the approval of plaintiff's treatment and ordered the medications. Haider Shah Decl. Ex. A at 179, 181.  Plaintiff is claiming that the delay in treating him for HCV was the unconstitutional conduct.  To the extent that defendant Wright had any actual involvement at all, it was ***after*** the allegedly unconstitutional delay had occurred.

Plaintiff claims that he can establish personal responsibility either because defendant Wright created an unconstitutional policy or because he failed to properly train physicians such as defendant Haider Shah in the proper care of inmates with HCV.  Compl. ¶¶ 70, 71.  Plaintiff attempts to hold defendant Wright liable for the allegedly unconstitutional policy of denying inmates HCV treatment if they are within fifteen months of parole, or the policy of denying inmates HCV treatment if they have not participated in a drug treatment program.

The court would first point out that prior to 2005, the HCV Guidelines contained a provision stating that the inmate's "anticipated incarceration" had to be

23

adequate to complete the evaluation and treatment. Wright Decl. Ex. A-2, June 20,
2004 Guidelines at p.4 (Criteria for Treatment No. 13).  The length of anticipated
incarceration required was different for different genotypes of the virus: nine months
for genotypes 2 and 3 and fifteen months for genotypes 1 and 4, from the time of
referral, including the 24-48 week treatment course. *Id.*  This section provided that
inmates who would not be able to complete a course of treatment due to their time of
incarceration would receive a baseline evaluation and be referred for medical follow-
up and treatment upon release. *Id.*  Additionally, inmates who had a substance abuse
history were required to successfully complete or be enrolled in a substance abuse
program. *Id.* (Criteria for Treatment No. 11).

In October 2005, the Guidelines were revised, and the above requirements were
amended. Wright Decl. Ex. A-1 at p.2.  Instead of requiring the substance abuse
program, the new Guidelines "strongly encouraged" inmates with a history of
substance abuse to complete the program "since dealing with alcohol or substance use
issues is an essential part of their Hepatitis C/liver treatment and protection program."
*Id.* (Criteria for Treatment No. 11).  Finally, if the inmate does not have an anticipated
incarceration adequate to complete the evaluation and treatment, the new Guidelines
provide that he could begin the treatment, and he would be followed ***after release***
through the "Continuity Program," as long as the inmate agreed to the conditions of
the program. *Id.* (Criteria for Treatment No. 13).

While defendant Wright might be responsible for helping to create these
guidelines, plaintiff in this case was ***never*** denied treatment ***because of*** the failure to

24

take the substance abuse program since he completed the program in 2000, long before he requested the treatment that became available in *2002*. *See* Haider Shah Decl. Ex. A at 350.  Thus, even if defendant Wright were responsible for the "policy," plaintiff was never denied treatment based on this policy.

Plaintiff somehow claims that he also may have been denied the HCV treatment because of the pre-2005 policy limiting treatment based on an inmate's anticipated length of incarceration.  There are some notations in the record, indicating that he was going to be paroled in the near future.  On August 7, 2003, a nurse noted on plaintiff's AHR that plaintiff "goes home in 30-60 days." *See* Haider Shah Decl. Ex. A at 321. On August 5, 2005, Nurse Perrotta wrote in the AHR that plaintiff "states [sic] is paroling soon - needs psych eval." *Id.* at 247.  Based upon plaintiff's August 5, 2005 statement, on the same day, Nurse Perrotta completed a "Request and Report of Consultation Form," with a similar notation that plaintiff "states [sic] paroling soon - mandatory psy. eval. needed." *Id.* at 245.

Neither of these notations indicates that plaintiff was being denied HCV treatment because he was not going to be incarcerated long enough.[19]  In any event, by October 13, 2005, DOCS had removed the anticipated length of incarceration requirement from the Guidelines.  Although plaintiff states that on August 7, 2003, defendant Haider Shah told plaintiff that "he was too close to going home, '30-60

---

[19] In fact, the court notes that the only time that plaintiff's length of incarceration was mentioned in conjunction with HCV treatment was in April of 2002, while plaintiff was still at Franklin, and a Hepatitis Consult Request was completed. Haider Shah Decl. Ex. A at 350.  At that time, the older guidelines required at least 15 months, and the individual completing the form stated that plaintiff *met the criteria*. *Id.*

days', 'not ready for medication,'" plaintiff cites the AHR entry written by Nurse Dooley, *not* by defendant Haider Shah. *See* Haider Shah Decl. Ex. A at 321; Pl. Ex. B at 72.  In any event, plaintiff was clearly *not* being released within 30-60 days of August 7, 2003, nor was "paroling soon" in 2005 when the note was written by Nurse Perrotta.  Thus, plaintiff was not subjected to either "policy" that he claims was unconstitutional.

The court notes that in *Hilton v. Vasquez*, 235 F.R.D. 40 (N.D.N.Y.  2006), District Judge David N. Hurd certified a class of inmates who had been denied HCV treatment based upon their failure to complete a DOCS-sponsored substance abuse program. *Id.* at 50-54.  By memorandum, defendant Wright had voluntarily rescinded the requirement, however, the court was concerned that the plaintiff class would not be assured of the appropriate relief. *Id.* at 46-50.  The parties entered into an interim settlement agreement in July of 2007, and on January 2, 2008, Judge Hurd approved the interim agreement as a final settlement agreement. *Hilton v. Vasquez*, 9:05-CV-1038, 2008 U.S. Dist. LEXIS 461 (N.D.N.Y. Jan. 2, 2008).  The settlement required DOCS to reevaluate any prisoner who was denied treatment for HCV "*because of*" the ASAT program. *Id.* at *3.

Plaintiff was not, and clearly is not a class member in *Hilton*.  Plaintiff in this case has obtained his treatment, and thus, only has a claim for damages.  Plaintiff was *never* denied treatment because he failed to participate in a substance abuse program. Nor does the record support that he was ever denied treatment because he was being

26

paroled "soon."[20]  Thus, plaintiff cannot show that he was denied treatment due to any "policy" that was created or condoned by defendant Wright.

Plaintiff's HCV drug treatment was delayed because of the requirement that an individual with a prior psychiatric history must be cleared by a psychologist or a psychiatrist prior to beginning the treatment.  Although this requirement is one of the criteria for treatment[21] and is, thus, part of the DOCS "policy," plaintiff is not challenging the "policy" or the requirement.  Plaintiff is claiming that defendant Haider Shah "failed to seek the psychiatric clearance until October 20, 2005," and "failed to acknowledge" that plaintiff was cleared for treatment for six months after he was cleared, causing an unconstitutional delay in treatment. Compl. ¶ 2.

Plaintiff claims that defendant Wright may be held liable because he failed to train and supervise employees such as defendant Haider Shah in the care of inmates who are identified by their treating physicians as being in need of HCV treatment. Compl. ¶ 70.  Defendant Wright is the Chief Medical Officer of DOCS and is not located at any particular correctional facility.  Because the allegedly unconstitutional

---

[20] The court notes that the amended complaint in *Hilton* also alleged that it was difficult to enroll in the programs due to the number of inmates who took the programs. (Dkt. No. 11 at ¶ 4) (*Hilton*).  The amended complaint further alleged that even if an inmate finally had the opportunity to enroll in the substance abuse program, he would be denied participation in the program if the inmate were going to be released on parole before finishing the program. *Id.* ¶ 5. There was no challenge, however, to the requirement that an inmate had to have enough time remaining on their sentence before they were allowed to get treatment.  There were various ***other*** issues related to the requirement that inmates participate in the substance abuse programs, and one of the important allegations  was that the DOCS policy did not allow for individualized assessments of an inmate's drug history or medical condition prior to imposing this requirement. *Id.* ¶ 3.

[21] *See* Hepatitis C Primary Care Guidelines dated October 13, 2005, Criteria for Treatment No. 10. Wright Decl. Ex. A-1 at p.6.

policies plaintiff has cited as created by defendant Wright were not applied to plaintiff, plaintiff would now have to show that defendant Wright was "grossly negligent" in supervising defendant Haider Shah. *Colon*, 58 F.3d at 873.

Plaintiff does not claim that defendant Wright had notice of the alleged improper delay in plaintiff's case.  Thus, it is unclear how defendant Wright would be "grossly negligent" in supervising defendant Haider Shah, given that the adequacy of the general policy of requiring psychiatric clearances for HCV treatment is ***not in dispute***.  Thus, plaintiff has failed to show that defendant Wright was personally involved in plaintiff's alleged denial of constitutionally adequate medical care, and any claim for damages may be dismissed as against defendant Wright.  The court may proceed to consider plaintiff's medical care claims as against defendant Haider Shah.

## 4.   **Medical Care**

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  There are two elements to the deliberate indifference standard.  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind.  *Id.* at 184 (citing inter alia *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

28

### A.  Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)(citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.*  The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer*, 511 U.S. at 844-47).

The second part of the objective test asks whether the ***inadequacy*** in the medical care is "sufficiently serious." *Id.* at 280.  The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)).  If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)).  However, in cases such as this one, where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.*  If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith*, 316 F.3d at 185).  Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as

29

the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### B. Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 300 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer*, 511 U.S. at 835-37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer*, 511 U.S. at 839-40).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance*, 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk, however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844. Thus, the court stated in *Salahuddin*, that the defendant's believe that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively

30

unreasonable, a defendant's mental state may be nonculpable." *Salahuddin* 467 F.3d at 28.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams*, 474 U.S. 327, 332 (1986)(negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

## C. Application

In this case, plaintiff essentially claims that defendant Haider Shah was deliberately indifferent to plaintiff's serious medical needs because the doctor delayed plaintiff's HCV treatment from October of 2002 until June of 2006 for a series of

improper reasons.  Plaintiff's other claims, alleging that defendant Haider Shah also failed to "monitor plaintiff's elevated liver functions tests (LFT's), for nineteen straight months, when the HCV protocol called for monitoring every 8-12 weeks; failed to refer plaintiff to a liver specialist; and failed to order a "prescribed" liver biopsy are related to the delay.

No one disputes that HCV is a "serious medical condition."  However, since a review of the plaintiff's medical records in this action show that plaintiff received **substantial** medical care for his illness, this court must analyze the Eighth Amendment claim with reference to whether the "delay" was sufficiently serious.  The Second Circuit opinion in *Salahuddin* is instructive in this regard.  The plaintiff in *Salahuddin* also had HCV, and the defendant doctor cancelled plaintiff's liver biopsy, postponing the procedure for a period of five months. 467 F.3d at 281.  The court stated that it could not determine as a matter of law that it was "reasonable" for a prison official to postpone the plaintiff's course of treatment for HCV "because of the possibility of parole without an individualized assessment of the inmate's actual chances of parole." *Id.*  The court then assumed that the five-month delay was "objectively serious" because the defendants did not address the issue on appeal.[22]

The delay in this case was approximately three and one half years, according to

---

[22] The Second Circuit pointed out that the defendants incorrectly believed that the objective prong turned upon the severity of plaintiff's HCV, rather than the severity of the delay. *Salahuddin*, 467 F.3d at 281 n.7.  The court relied on the defendants' forfeiture of the argument.

plaintiff.[23]   The court first finds that plaintiff has not raised a material issue of fact regarding the objective factor in the Eighth Amendment analysis.  There is no evidence that the delay was "substantially serious."  It is clear that on October 23, 2002, defendant Haider Shah's entry in plaintiff's AHR "ordered" a psychiatric clearance.  In *Salahuddin*, the defendants did not present any evidence regarding the "seriousness" of the harm caused by the five month delay. 467 F.3d at 281. Unlike defendants in *Salahuddin*, the defendants in this case have presented evidence that the delay was not "substantially serious."  Both defendants and Dr. Rogers state in their declarations that because HCV progresses so slowly, the three year delay was "unremarkable." Wright Decl. ¶ 35; Haider Shah Decl. ¶ 34; Rogers Decl. ¶ 14.[24]  Dr. Rogers states that "it is unlikely that drug therapy in 2002 or 2003 would have been any more successful than the course of therapy [plaintiff] received in 2006." Rogers Decl. ¶ 14.  Thus, plaintiff has not raised a genuine issue regarding the objective prong of the test.  In any event, assuming that the delay were substantially serious, the court will proceed to analyze the subjective prong of the test.

Again, reference is made to the analysis in *Salahuddin*.  Notwithstanding the question of fact regarding the reasonableness of the defendant's actions in *Salahuddin*, the court granted summary judgment for the defendant doctor based upon the

---

[23] As stated above, plaintiff complains about the delay between October of 2002 and June 1, 2006, whereas defendants interpret the "delay" as beginning in October 2002, but ending on October 30, 2005, when plaintiff's psychiatric clearance was obtained.

[24] Dr. Rogers actually states that "four years is not a particularly long period in the course of a Hepatitis C progression." Rogers Decl. ¶ 14.

subjective element of the analysis. *Id.* at 281-82.  The court found that the doctor had

written a letter expressing his belief that because "Hepatitis C leads to cirrhosis only

over 20 to 30 years, Salahuddin 'is in no immediate danger' and that 'f[ro]m a medical

standpoint [,] there is no urgency for [the cancelled liver biopsy].'" *Id.* at 282

(alteration in original).  The court stated that while the assumption could have been

"unsound" absent an investigation into the progression of the plaintiff's HCV, the

doctor's letter was "direct evidence that he was not aware of a substantial risk that

postponing the liver biopsy would cause serious harm." *Id.*

The court in *Salahuddin* stated that there was no circumstantial evidence to

contradict the doctor's conclusion, distinguishing the court's own decision in *Johnson

v. Wright*, 412 F.3d 398 (2d Cir. 2005). *See Salahuddin*, 467 F.3d at 282.  In *Johnson*,

another HCV case, the Second Circuit denied summary judgment because there was

evidence raising a genuine issue of material fact surrounding the defendant's decision

to administer one drug over another, based upon other treating physicians'

recommendations of the rejected medication. *Id.*  The court stated that *Johnson*

involved a case of "willful blindness," and the idea of "willful blindness" would have

required that someone arouse the defendant's suspicion that postponing Salahuddin's

biopsy would be seriously harmful. *Id.* (distinguishing *Johnson*, 412 F.3d at 404-05).

In this case, defendant Haider Shah's explanation for the delay in providing

plaintiff with the HCV treatment is based upon the lack of a psychiatric "clearance"

between October 2002 and October 2005.  The HCV protocol clearly requires a

psychiatric clearance for individuals who have a history of "major depression or other

major psychiatric illness." Wright Decl. Ex. A-1, Criteria for Treatment No. 10.  The

requirement itself is a medical judgment that is not in dispute in this case.  In any

event, there appears to be no question that one of the side effects of the HCV

treatment is "depression with associated suicidal feelings," making the requirement of

psychiatric clearance reasonable. *See* Rogers Decl. ¶ 18.  Dr. Rogers states that some

inmates who receive the HCV treatment "will need to be followed by psychiatry and

treated with mood altering drugs." *Id.* ¶ 20.

Defendant Haider Shah states that "multiple requests" were submitted for

psychiatric evaluations of plaintiff. Haider Shah Decl. ¶ 24.  Plaintiff's October 23,

2002 AHR shows that defendant Haider Shah noted the need for a psychiatric

clearance for "possible" HCV treatment. Haider Shah Decl. Ex. A at 331.  In his

declaration, defendant Haider Shah cites this notation in the AHR as one of the

multiple "requests" that were "submitted" for "psychiatric evaluations" between

October 2002 and October of 2005. Haider Shah Decl. ¶ 24.  The other dates cited by

defendant Haider Shah are October 29, 2004; August 5, 2005; and October 20, 2005,

the date that clearance was finally obtained. *Id.* (citing Ex. A at 262; 245-47; 239).

A review of the above "requests" shows that the first is a "notation" in the

AHR.  The second request is a "Mental Health Referral" form, dated October 29,

2004. Haider Shah Decl. Ex. A at 261.  The form states that plaintiff was requesting to

resume the psychiatric medications that he had refused two months before because of

increased "frustration, anxiety, and sleeplessness." *Id.*  The AHR contains a nurse's

entry, dated October 29, 2004 stating that plaintiff was requesting to resume his Paxil

35

and Vistaril. *Id.* at 263.

The third request consists of an AHR entry and a "Request and Report of Consultation," dated August 5, 2005. Haider Shah Decl. Ex. A at 245, 247.  This entry on the AHR is made by a nurse and follows the notation that plaintiff "states" he is paroling soon. *Id.* at 245.  The top of the "Request and Report of Consultation" form is also completed by the nurse and states that plaintiff told the nurse that he was paroling soon, and the nurse wrote that plaintiff needed a mandatory psychiatric evaluation. *Id.* at 247.  The bottom of the form is blank, indicating that the evaluation was never performed.[25] *Id.*

The final request is the October 20, 2005 "Request and Report of Consultation," and the AHR entry dated the same day, referencing the HCV treatment as the reason for the request. *Id.* at 239, 240.  The bottom of the form was completed on the same day, stating that plaintiff was only treated briefly for "a few months for depression" after the death of a family member and stating that there was no contraindication for the treatment. *Id.* at 239.  The AHR entry states that on October 30, 2005, plaintiff was "asking" about the HCV treatment, and defendant Haider Shah referred to all the requests for psychiatric consultation listed above and stated that there had been "no psych, clearance." *Id.* at 240.

In the October 30, 2005 AHR entry, defendant Haider Shah refers to another

---

[25] It is possible that the evaluation was never performed because plaintiff was ***not*** paroling soon.  It appears from other portions of the plaintiff's medical records that psychiatric evaluations may be required for parole purposes. *See* Haider Shah Decl. Ex. A at 383-84 (Mental Health Status Report for Division of Parole, dated August 20, 2001).

prior request, dated June 25, 2004. *Id.*  A review of the June 25, 2004 AHR entry

shows that one of defendant Haider Shah's "orders" on that date was a "note to

tracking nurse" to check for the "Hep C tx." *Id.* at 286.  The entry also states "Ret if

not written." *Id.*  On October 30, 2005, defendant Haider Shah ordered "Psych.

Clearance" and "GI Consult." *Id.*  There is a notation by the nurse indicating that she

"so noted" the ordered section of the entry.[26] *Id.* The October 29, 2004 and August 5,

2005 requests, however, do not reference HCV or HCV treatment as the reason for the

referral.

Interestingly, the record contains various versions of the October 30, 2005

request for psychiatric clearance.  Plaintiff himself has submitted four such versions.

Pl. App. B at 88-92.  One of these versions is simply the referral form with only the

top portion (the request) completed. *Id.* at 91.  The second has the top portion and the

bottom portion (the clearance) completed. *Id.* at 88, 90 (two copies).  The third

document contains a notation at the bottom, written by defendant Haider Shah, which

appears to be dated June 1, 2006, but the notation is very difficult to read. *Id.* at 92.  It

appears to state "How did it get . . . without . . . us . . . seeing." *Id.*  Defendants' exhibit

contains the same notation. Haider Shah Decl. Ex. A at 239.

Finally and most interestingly, ***plaintiff's appendix*** contains a version of the

document with what appears to be a note copied onto the top left corner of the

document, written by Dr. L. Kalias, the doctor who signed the clearance at the bottom.

---

[26] This notation also appears on the October 23, 2002 entry. Haider Shah Decl. Ex. A at
331.

Pl. App. B at 89.  The note states "Sorry this took so long - Also FYI - Gave MH approval for Hep C tx today." *Id.*  It is unclear why Dr. Kalias would be apologizing for taking "so long," when the form request and the clearance are dated the same day, unless, there had in fact been prior requests that had gone unanswered.  This version does not appear in the defendants' exhibits.

It thus appears that although plaintiff seeks to blame defendant Haider Shah for the delay, it may not be completely attributable to this defendant.  Defendant Haider Shah also states in his declaration that plaintiff may not have been cleared sooner because between 2002 and 2005, he was reporting symptoms of depression and was receiving medication for the condition. Haider Shah Decl. ¶ 25.  The records ***do*** show that plaintiff had periods of psychiatric treatment.  Plaintiff had signs of depression as early as January 1995, while he was incarcerated at Collins Correctional Facility. Haider Shah Decl. Ex. A at 534.  However, in 1999, plaintiff was psychiatrically evaluated by Dr. David Goldman at Riverview Correctional Facility for the Parole Board, and there were "no current psychiatric problems." *Id.* at 420-23.  Dr. Goldman had the same opinion in 2001 when he performed another psychiatric review for the Parole Board.[27] *Id.* at 383-85.

On February 25, 2002, plaintiff was again examined by Dr. Goldman, who wrote a report, changing plaintiff's OMH level to Level III[28] and prescribing Zyprexa.

_____

[27] It is clear from these documents that each time an inmate is considered for parole, there is a mandatory psychiatric examination.

[28] Mental Health Service Level 3 indicates that the inmate needs short term chemotherapy for disorders such as anxiety, moderate depression, or adjustment disorders. Haider Shah Ex. A

*Id.* at 372.  Dr. Goldman wrote a second report the next day, February 26, 2002, continuing plaintiff's OMH level as III. *Id.* at 368-69.  Plaintiff was still taking the psychiatric medication when he was transferred to Franklin on March 15, 2002. *Id.* at 365, 368.  The medications were discontinued by plaintiff's own request on March 30, 2002. *Id.* at 358-59.  His OMH Level was changed to 6 on September 13, 2002. *Id.* at 335.

Although there was no discussion of plaintiff's mental status in the 2003 medical records, in plaintiff's April 8, 2004 AHR entry, there is a notation that plaintiff was complaining of being depressed, that a relative was dying, and that he wanted to resume his psychiatric medication. Haider Shah Decl. Ex. A at 294.  An urgent mental health referral was made. *Id.* at 293.  Plaintiff was prescribed his Paxil and Vistaril on April 12, 2004. *Id.* at 291.  Although plaintiff stopped taking this medication in June of 2004, he resumed the medication in October of 2004. *Id.* at 261, 263, 283.  The court notes that plaintiff did experience some psychiatric problems on August 6, 2006, during the course of his HCV treatment. *Id.* at 155-56.

Defendant Haider Shah also states that aside from plaintiff's psychiatric history, there were physical conditions to consider prior to beginning the HCV treatment. Haider Shah Decl. ¶ 27.  The medical personnel were concerned about the risk to plaintiff's thyroid and the scarring of plaintiff's internal organs due to a gunshot wound. *Id.*  Defendant Haider Shah points out that plaintiff did experience some

at 444.(listing of levels).  Level 6 is an inmate who does not need Mental Health Services. *Id.*
The medical providers use roman numerals and arabic numbers interchangeably to refer to these
levels.

thyroid problems as a result of the treatment. *See* Haider Shah Decl. ¶ 27 & Ex. A at 9,
17, 20, 23-24.  Plaintiff was referred to a specialist for evaluation. Ex. A at 20.

Although plaintiff in this case complains about the "delay" between October of
2005 and June of 2006 when he began his treatment, there is no evidence of "delay."
Dr. Rogers and defendant Wright state that even after the psychiatric clearance was
obtained, further evaluation was required, and "significant medical steps" had to be
taken before the administration of the treatment. Rogers Decl. ¶ 22; Wright Decl. ¶ 34.
Beginning in January of 2004, plaintiff had laboratory tests more frequently.[29]  After
the psychiatric clearance was obtained in October 2005, plaintiff was referred to a
gastroenterologist, and had a liver biopsy prior to beginning his treatment in June of
2006. Haider Shah Decl. Ex. A at 192-93 (biopsy report).  Plaintiff's extensive
medical care continued throughout his HCV treatment and afterward.

Defendant Haider Shah states that upon completion of the HCV therapy,
plaintiff's viral levels had become almost undetectable, however, the virus re-
emerged. Haider Shah Decl. ¶ 34.  Defendant Haider Shah states that this re-
emergence was not related to the delay in treatment, but rather due to the effectiveness
of the drugs on plaintiff's particular virus. *Id.*  Defendant Wright states that by the
time that plaintiff had his liver biopsy on March 27, 2006, the fibrosis in his liver had

---

[29]Plaintiff had laboratory testing for liver function done twice in January 2004; July; and
October of 2004. Haider Shah Decl. Ex. A at 306, 308-09, 278-81, 268.  On October 20, 2004,
defendant Haider Shah made a request for a CT scan of plaintiff's abdomen to rule out a possible
obstruction of plaintiff's bile duct because plaintiff was complaining of vomiting and weight loss.
*Id.* at 260, 269.  The CT scan was performed on November 5, 2004.  Plaintiff had laboratory tests
again on May 25, 2005; February 14, 2006; March 7, 2006; March 16, 2006; and April 4, 2006.
*Id.* at 250, 220-23, 217, 211-12, 186.

progressed to Stage 3, a severe degeneration, falling short of cirrhosis. Wright Decl. ¶ 27.

There is no evidence in this case that defendant Haider Shah was "deliberately indifferent" to plaintiff's condition.  At worst the failure of defendant Haider Shah to follow up on the request for psychiatric clearance was inadvertence or negligence,[30] and it is unclear whether the delay was attributable to defendant Haider Shah since the notation on plaintiff's exhibit from Dr. Kalias contains an apology that the clearance "took so long."  The delay appears to have been due to a possible misunderstanding regarding the request for psychiatric clearance.

According to Dr. Rogers, the delay was based on a "combination of legitimate factors." Rogers Decl. ¶ 30.  These factors were based on medical reasons, and any delay between obtaining the psychiatric clearance in October of 2005 and the eventual commencement of the treatment in June of 2006 was due to plaintiff undergoing the required tests prior to the administration of the drugs, including plaintiff's biopsy in March of 2006. Rogers Decl. ¶ 31.  As in *Salahuddin*, since all of the doctors in this case have indicated that it is their medical judgment that the disease progresses so slowly that even a four year delay would not affect the efficacy of plaintiff's treatment,[31] there is no evidence to show that defendant Haider Shah was deliberately

---

[30] The court in no way states this as a "finding."

[31] As stated above, although plaintiff initially responded to the treatment, the virus has re-emerged.  All the doctors state, however, that the re-emergence of the virus is not due to any delay in treatment, but rather due to the type of virus.  The doctors state that because plaintiff is a "relapser," the virus would have re-emerged whether he had the treatment in 2002 or 2006. Haider Shah Decl. ¶ 34; Wright Decl. ¶ 27. *See also* Rogers Decl. ¶ 28 ("the likelihood of a

indifferent to a serious risk to plaintiff.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 29) be **GRANTED**, and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: April 29, 2009

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge

---

different response to the same drugs is not high").